**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

HERACLIO GUTIERREZ,

        Petitioner,

v.

        Case Nos.:  3:21-cv-938-TJC-MCR
                         3:17-cr-225-TJC-MCR

UNITED STATES OF AMERICA,

        Respondent.

_____

**ORDER**

### I.    Status

Petitioner Heraclio Gutierrez, through counsel, moves under 28 U.S.C. § 2255 to vacate his conviction and sentence. See Second Amended Motion Under 28 U.S.C. § 2255 (Civ. Doc. 7);[1] Memorandum of Law in Support (Civ. Doc. 5); Third Amended Motion[2] (Civ. Doc. 31). Following a jury trial in November 2018, at which Petitioner was represented by attorneys Ray E. Dunn and Vanessa Newtson, Petitioner was found guilty of conspiracy to distribute 500 grams or more of methamphetamine and sentenced to a term of 200 months

---

[1] Citations to documents filed in the civil case are designated "Civ. Doc." and citations to documents filed in the criminal case are designated "Crim. Doc."

[2] The Second Amended Motion (Civ. Doc. 7) includes Grounds One through Four; the Third Amended Motion (Civ. Doc. 31) includes Ground Five.

imprisonment to be followed by 5 years of supervised release. The Court recently granted Petitioner's motion for a sentence reduction under 18 U.S.C. § 3582(c)(2) and reduced his term of imprisonment to 188 months.[3] See Order (Crim. Doc. 298).

Petitioner challenges his conviction and sentence on five grounds. In Grounds One through Four, Petitioner argues that Dunn provided ineffective assistance of counsel. See Civ. Doc. 7 at 5-12. In his fifth ground for relief, Petitioner contends that he "is entitled to a new trial based on newly discovered evidence and resulting Brady[4] and Giglio[5] claims arising therefrom." Civ. Doc. 31 at 1 (emphasis omitted).[6]

The Government responded in opposition to all five Grounds (Civ. Docs. 17, 33). And Petitioner replied (Civ. Docs. 20, 45). The Court held an evidentiary hearing on Grounds One, Two, and Three, and incorporates herein the Transcript (Civ. Doc. 49) of that hearing. See Order (Civ. Doc. 34); Minute Entry

---

[3] According to the Federal Bureau of Prisons' website, Petitioner's current release date is February 25, 2030. See Federal Bureau of Prisons, Find an inmate, available at https://www.bop.gov/inmateloc/ (last visited June 18, 2026).

[4] Brady v. Maryland, 373 U.S. 83 (1963).

[5] Giglio v. United States, 405 U.S. 150 (1972).

[6] The allegations in the Second Amended Motion and Third Amended Motion are just that – allegations. Petitioner did not verify the Motions or otherwise swear to the truthfulness of the allegations; instead, counsel filed the Motions on Petitioner's behalf. Thus, in analyzing Petitioner's Grounds, the Court relies on Petitioner's testimony at the evidentiary hearing to the extent it is credited herein.

(Civ. Doc. 47).[7] Following the evidentiary hearing, the Court afforded the parties time to file optional supplemental briefing. The Government did so (Civ. Doc. 50); Petitioner chose not to file any supplemental briefing. This case is ripe for review.

## II. Background

In its opinion issued on Petitioner's direct appeal, the Eleventh Circuit Court of Appeals summarized the facts and procedural history of the case:

> Dustin Whittaker was a user and distributor of methamphetamine. Looking for a better source of supply, Whittaker was put in touch with a man in Texas named "Hector," whom Whittaker identified as Gutierrez at trial. At first, Whittaker drove to Austin, Texas, to buy methamphetamine from Gutierrez.
>
> Later, Gutierrez arranged for a courier to transport larger quantities of methamphetamine by vehicle to Whittaker in Jacksonville, Florida. In June 2017, courier Luisana Ramirez-Chavez arrived in Jacksonville with approximately ten pounds of methamphetamine, which was hidden within a compartment on the underside of the vehicle. Gutierrez drove to Jacksonville to oversee the delivery. In August 2017, Gutierrez arranged for Ramirez-Chavez to deliver another shipment of methamphetamine. Gutierrez again drove from Austin to oversee the delivery. This time, Whittaker removed around twelve pounds of methamphetamine from the vehicle. Whittaker stored most of the second shipment in a storage unit.
>
> On August 14, 2017, Matthew Yarborough, a special agent with the Florida Department of Law Enforcement, received information from a confidential source that Whittaker had just

---

[7] Without objection from Petitioner, the Court admitted Government Exhibits 1 through 19 at the evidentiary hearing. See Civ. Doc. 49 at 15; Civ. Doc. 48 (exhibits). All of the exhibits otherwise appear in the record in this case or the criminal case.

3

received a large shipment of methamphetamine that he had placed in his storage unit. After confirming with management that Whittaker rented the storage unit in question, Yarborough asked an officer and his drug-detection dog to conduct an exterior sniff of several units in that area. The dog alerted to Whittaker's storage unit.

Yarborough then applied for, obtained, and executed a search warrant for the storage unit. In the unit, law enforcement officers found a duffel bag containing multiple packages of suspected methamphetamine. They seized the packages, and Yarborough left a copy of the search warrant. Whittaker found the search warrant the next day, after discovering that the methamphetamine had been taken. Whittaker then spoke with Yarborough and agreed to cooperate with the investigation. He testified for the government at Gutierrez's trial.

Based on information Whittaker provided, Yarborough was able to identify Gutierrez as Whittaker's source of supply. Further investigation revealed that Gutierrez and coconspirator Mitchell Loor, who was involved in the earlier two shipments, were planning to have another methamphetamine shipment transported to Jacksonville by Ramirez-Chavez. Law-enforcement officers intercepted Ramirez-Chavez en route to Jacksonville in October 2017, and a drug-detection dog alerted to the presence of drugs in the car. The car, which Gutierrez and Loor had purchased in late August, was taken to a shop for further investigation and found to contain over five kilograms of methamphetamine. Ramirez-Chavez testified at trial about the deliveries and her interactions with Gutierrez.

The government called two forensic chemists employed by the Drug Enforcement Administration ("DEA") to testify as experts regarding the substances recovered. Tyrone Shire testified that the October shipment contained 5,167 grams of 98% pure methamphetamine. Jose Conde testified that the packages recovered from the storage unit in August contained 2,185.9 grams of 73% pure methamphetamine. The district court overruled Gutierrez's objections that Shire and Conde were not qualified to testify as experts under Rules 702 and 705, Fed. R. Evid., and

4

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The jury returned a verdict finding Gutierrez guilty of a distribution conspiracy involving 500 grams or more of meth.

Gutierrez's presentence investigation report ("PSR") determined that he was accountable for 4.54 kilograms of methamphetamine, based on the ten-pound shipment of unknown purity in July 2017, and 9.03 kilograms of "methamphetamine (actual)," based on the twelve-pound shipment of 73% purity in August and the 5,167-gram shipment of 98% purity in October.[] The PSR then converted these amounts to their marijuana equivalents and combined them to derive a single offense level. See U.S.S.G. § 2D1.1 cmt. n.8(B). The combined converted drug weight was 189,680 kilograms of marijuana, which corresponded to a base offense level of 38.

Gutierrez objected to the drug-quantity finding and argued that he should be held accountable for only the quantity of methamphetamine recovered from the storage unit. The district court overruled the objection at sentencing. The court found that the drug quantity was supported by trial testimony and that, even if it was exaggerated to some degree, it was still well above the amount necessary to trigger the highest base offense level of 38. The court's rulings resulted in a total offense level of 38 and a corresponding guideline range of 235 to 293 months. The court ultimately sentenced Gutierrez to 200 months in prison.

United States v. Gutierrez, 810 F. App'x 761, 763-64 (11th Cir. 2020) (footnote omitted).

On direct appeal, Petitioner argued that Dunn was ineffective for multiple reasons. See id. at 764-65. Despite recognizing that "the record contains instances where counsel's inexperience in federal court is apparent," the Eleventh Circuit declined to address the ineffectiveness claims because the

5

record was not sufficiently developed. See id. at 65. Petitioner raised several other arguments, all of which the Eleventh Circuit rejected. See id. at 765-70. Thus, the Eleventh Circuit affirmed Petitioner's conviction and sentence. See id. at 770. This § 2255 proceeding followed.

### III.   Governing Legal Principles

Under 28 U.S.C. § 2255, a person in federal custody may move to vacate, set aside, or correct his sentence. Section 2255 authorizes a district court to grant relief on four grounds: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). Only jurisdictional claims, constitutional claims, and claims of error that are so fundamental as to cause a complete miscarriage of justice will warrant relief through collateral attack. United States v. Addonizio, 442 U.S. 178, 184-86 (1979); Spencer v. United States, 773 F.3d 1132, 1138 (11th Cir. 2014) (en banc).

A § 2255 movant "bears the burden to prove the claims in his § 2255 motion." Rivers v. United States, 777 F.3d 1306, 1316 (11th Cir. 2015); see also Beeman v. United States, 871 F.3d 1215, 1221–23 (11th Cir. 2017). If "'the evidence does not clearly explain what happened . . . the party with the burden loses.'" Beeman, 871 F.3d at 1225 (quoting Romine v. Head, 253 F.3d 1349, 1357 (11th Cir. 2001)). A § 2255 movant will not be entitled to relief, or an evidentiary

6

hearing, "when his claims are merely 'conclusory allegations unsupported by specifics' or 'contentions that in the face of the record are wholly incredible.'" Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (citation omitted).

"[A] collateral attack is the preferred vehicle for an ineffective-assistance claim." United States v. Padgett, 917 F.3d 1312, 1318 (11th Cir. 2019). To establish ineffective assistance of counsel, a § 2255 petitioner must show both: (1) that his counsel's performance was constitutionally deficient, and (2) that counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); Martin v. United States, 949 F.3d 662, 667 (11th Cir. 2020). In determining whether counsel was deficient, "[t]he standard for effective assistance of counsel is reasonableness, not perfection." Brewster v. Hetzel, 913 F.3d 1042, 1056 (11th Cir. 2019) (citing Strickland, 466 U.S. at 687). "In the light of the 'strong presumption' that counsel's actions [fell] within the wide range of constitutionally adequate assistance, a movant 'must establish that no competent counsel would have taken the [challenged] action.'" Khan v. United States, 928 F.3d 1264, 1272 (11th Cir. 2019) (quoting Chandler v. United States, 218 F.3d 1305, 1314-15 (11th Cir. 2000) (en banc)). To establish prejudice, the petitioner must show a reasonable likelihood that the result of the proceeding would have been different but for counsel's error. Martin, 949 F.3d at 667 (citing Padilla v. Kentucky, 559 U.S. 356, 366 (2010)). The Court considers the totality of the evidence in determining whether a

petitioner has established deficient performance and prejudice. Strickland, 466 U.S. at 695. However, because both prongs are necessary, "there is no reason for a court . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

## IV.  Discussion

Dunn, unknown to the Court before this case, is a Texas lawyer hired by Petitioner to be his lead counsel. The evidence established (and the Court's own observations confirmed) that Dunn was inexperienced in federal practice but nevertheless had an outsized and unwarranted confidence in his own abilities.[8] Dunn associated Newtson to be local counsel. Newtson, well-known to the Court, has practiced here for a number of years and is an experienced and professional practitioner. Petitioner does not contend that Newtson rendered ineffective assistance of counsel.

### A. Grounds One and Two

In Ground One, Petitioner argues that Dunn was ineffective for failing to advise him, "in connection with the decision whether to accept a plea

---

[8] Following sentencing, the Court attempted to contact Dunn to compel him to provide Petitioner's appellate attorney with the full case file, but Dunn failed to comply, resulting in the Court referring him to the Disciplinary Committee for the Western District of Texas for appropriate disciplinary action. See Crim. Docs. 193, 199, 200, 207, 228. Both the Court and the parties also attempted to include Dunn in these § 2255 proceedings but he has evaded those efforts.

8

agreement, about the application of the federal sentencing guidelines to his case, which resulted in [Petitioner] not accepting the Government's proposed plea agreement and receiving a harsher sentence than if he had pled guilty." Civ. Doc. 7 at 5. According to Petitioner, despite the "overwhelming case" the Government had against him, Dunn advised Petitioner that "the Government had 'no case' against him – that is, that he could not be found guilty." Id. He asserts that "Dunn, who had never represented any client in federal court and had no federal criminal experience, did not advise [Petitioner] about the potential impact of the federal sentencing guidelines to his case." Id.

In Ground Two, Petitioner argues that Dunn was ineffective for not advising him to accept the Government's plea deal based on the strength of the Government's case against him. See id. at 7-8. According to Petitioner, the Government's case was "overwhelming," and "[t]here was no defense." Id. at 7. Nevertheless, because "Dunn advised [Petitioner] that the Government had 'no case' against him," Petitioner rejected the Government's plea offer. Id. at 8.

As to both Grounds One and Two, Petitioner concludes:

If Dunn had properly advised [Petitioner] of the strength of the Government's case[,] . . . and had he explained the weakness of his factual and legal defenses, as well as the full adverse impact on sentencing of a guilty verdict compared to the sentencing consequences under the proposed plea agreement, . . . and properly advised [him] that the best decision would be to accept the Government's plea agreement and plead guilty, . . . [Petitioner] would have followed that advice.

9

Id. at 5, 8. While both Grounds involve Dunn's alleged failure to properly advise Petitioner with respect to the Government's plea offer, Ground One focuses on Dunn's failure to advise Petitioner of the sentencing guidelines, and Ground Two focuses on Dunn's advice as to the strength of the Government's case. A summary of the relevant evidence developed at the evidentiary hearing follows.

On May 8, 2018, Newtson emailed Dunn explaining what she believed the sentencing guideline calculations would be in the case (Level 32). Civ. Doc. 17-9 at 2. Later that same day, she emailed him again, explaining that she had just spoken with the prosecutor, and the prosecutor explained that she believed the guidelines to be higher (Level 36 or 38). Id. at 1.

On August 13, 2018, approximately three months before trial, the Government sent a plea offer to Petitioner that included a detailed factual basis and a letter explaining the offer. See Civ. Doc. 17-13 (letter); Civ. Doc. 7-2 (plea offer). The Government's letter advised that it was prepared to prove that the amount of methamphetamine attributable to Petitioner was at least 15 kilograms or more, which would trigger a Base Offense Level 36 for purposes of the sentencing guidelines. Doc. 17-13 at 2. The letter also discussed the dangerous weapon enhancement (for the firearm found on Petitioner at the time of his arrest), which, if found to apply, would increase his Base Offense Level by two. Id. On the other hand, the Government explained that if Petitioner pled guilty, the Government would recommend a two-level downward departure for

10

acceptance of responsibility, and potentially another one-level downward departure at the time of sentencing if Petitioner timely entered a guilty plea. Id. The Government further explained two ways in which Petitioner could avoid the minimum mandatory ten-year statutory penalty. See id. at 2-3.

The factual basis detailed the facts supporting the offense charged. See Doc. 7-2 at 21-24. It explained Petitioner's relationship with Whittaker, Loor, and Ramirez-Chavez, focusing on their actions taken to distribute methamphetamine. See id.

On August 14, 2018, Newtson emailed Dunn expressing the importance of Petitioner timely receiving the plea offer and offering to meet with Petitioner "to review the plea agreement and letter from the prosecutor with him." Civ. Doc. 17-14. Two days later, Newtson emailed Dunn again, saying that she spoke to the prosecutor and the prosecutor advised that "she would not be able to amend the charge on [Petitioner] to a lesser that is not deportable." Civ. Doc. 17-15. On August 20, 2018, Dunn emailed Newtson asking her to visit Petitioner "to explain the government's recent offer, confirm his understanding, and secure his signature." Civ. Doc. 17-16. On August 27, 2018, Petitioner rejected the plea offer. See Civ. Doc. 17-13 at 5.

At the evidentiary hearing, Petitioner and Newtson testified as follows.[9] Petitioner, with assistance from an interpreter, testified that Dunn "suggested that [Petitioner] should go to trial," because "the government had a weak case." Civ. Doc. 49 at 10; see id. at 16-17 ("[Dunn] mentioned about the offer, the plea agreement, but that's when he told me that the government had a case of - - a weak case against me, and that's when he recommended me to go to trial."). Dunn told Petitioner "that there were good possibilities that [Petitioner] would win at trial." Id. at 10. In response to a question from the Government, Petitioner reiterated that Dunn "didn't guarantee, but he told me that I had a good chance" to win at trial. Id. at 18. Petitioner also testified that Dunn explained the only way for Petitioner to avoid deportation was to be found not guilty at trial. Id. at 10. And at the time Petitioner rejected the plea offer, Dunn had not explained the sentencing guidelines to him or how they affected his case. Id.

Petitioner also testified that he was "not blaming anyone else for what happened to [him]," but he maintained that he "was not part of what they [(co-conspirators Whittaker, Loor, and Ramirez-Chavez)] were doing." Id. at 20-21.

---

[9] The Court's and the parties' efforts to secure written and oral testimony from Dunn is well documented. See Orders (Civ. Docs. 14, 22, 43); see also Civ. Doc. 49 at 5-7, 23-25, 49-57. Dunn failed to respond to requests from the parties and ignored the Court's Orders. Thus, the Court is left without any testimony from him. But given the Court's findings, the lack of testimony from Dunn ultimately does not change the result.

12

He clarified that he did not have "any understanding of the legal concept of conspiracy," and had Dunn "explained to [him] the evidence that the government was going to have against [him] at trial," he would have pled guilty. Id. at 21-22. Petitioner indicated that he was looking to Dunn for advice on how to proceed with his case and not Newtson. Id. at 22. Nevertheless, he recognized that Newtson summarized the plea agreement for him; that he understood no charges would be dropped if he accepted the plea offer, but that he may have a chance at a lower sentence if he pled guilty; and he was aware of some of the evidence that would be presented against him, including the testimony of Whittaker and Ramirez-Chavez . Id. at 11, 15, 16, 18.

In Newtson's affidavit (filed prior to the evidentiary hearing), she avers, in pertinent part:

> I met with Mr. Gutierrez to review the plea agreement provided by the Government on August 27, 2018. We reviewed the entire plea agreement together. Mr. Gutierrez chose to reject the Government's plea agreement and signed the acknowledgement of plea offer. I provided this form to Mr. Dunn via e-mail. I explained to Mr. Gutierrez that the attorney for the Government was prepared to prove the case against him at trial and that she would introduce evidence to the jury regarding his alleged crimes. Mr. Gutierrez also understood that his co-conspirators would be testifying against him. Mr. Gutierrez chose to go forward to trial because he told me that Mr. Dunn told him he could win at trial. I was not part of the conversations that Mr. Dunn and Mr. Gutierrez had regarding the plea agreement and decision to go to trial.
>
>    . . . . Mr. Dunn, as lead attorney, discussed the discovery with Mr. Gutierrez and I was not part of those conversations. Mr. Gutierrez told me that Mr. Dunn discussed going to trial with him

13

and that was his decision, and that's why he rejected the plea agreement.

Civ. Doc. 24 at 2-3 (emphasis added).

At the evidentiary hearing, Newtson testified that she reviewed the plea agreement with Petitioner and answered any questions he had—she also stated that if she had the government's letter with her at that time, she would have reviewed it with Petitioner as well, but regardless, she would have summarized the most important parts of the agreement, including "the charges, the guidelines, the seriousness, [and] the minimums." Civ. Doc. 49 at 30, 34; see also id. at 36-37. Newtson stated that she explained the sentencing guidelines to Petitioner and that if he pled guilty, his sentence likely would be less severe. Id. at 30. Newtson, however, was not "the attorney receiving the discovery." Id. at 39. She clarified that her "job was not to review the discovery" and she did not provide Petitioner any legal advice as to the discovery or how it related to the case. Id. at 40. She did, however, "believe [she] told [Petitioner] that it was risky to go to trial," and "that it appears that the government had a lot of evidence, and the co-conspirators would testify against him, and that there was, again, a high conviction rate." Id. at 43. Nevertheless, Newtson stated that she was "not surprised" when Petitioner rejected the plea offer, because her impression was that Dunn's "goal" was to "go[] to trial." Id. at 41; see also id. at 46 ("I don't recall him ever telling me or us discussing that he was having doubts

14

about the defense case or about moving forward to trial. . . . [H]e just kept working on it and just getting ready for trial. So there was never a hesitation from him about going to trial[.]"). She explained that "it was evident . . . that Mr. Dunn was telling [Petitioner] the whole time of the length of the case that he could win at trial." Id. at 42. When asked if she made her own recommendation to Petitioner about whether he should accept the plea offer, Newtson explained:

> I don't remember, Judge, if I actually ever said, "If it was me" - - or if - - you know, "If it was up to me," or "If I was the only attorney on your case, this is what I would be advising you."
>
> I just do remember telling him, very big risk that he would get more time if he got convicted and went to trial as charged versus if he was negotiating.
>
> I didn't think - - I remember - - I didn't think it was my place to go against lead counsel, so I don't think I ever, like, just came out and said, "I think Ray Dunn is incorrect and you just need to listen to me and not" - - I don't feel that we had that conversation.
>
> I didn't take it that far because, frankly, he'd been in court a lot with Mr. Dunn, and I just felt like if no one - - you know, no one had stopped Mr. Dunn from going forward to trial. So I felt I guess he does have the skills necessary to - - to move forward with his client's case.
>
> You know, it wasn't a perfect case, and I think there were mistakes that were made in presenting the case at the hearings and whatnot and procedural and maybe some misunderstandings that Mr. Dunn had regarding the law. I mean, that's just evident from even just the - - . . . exhibits that's in there.
>
> But I didn't feel it was my place as local counsel just to say, "Hey, don't listen to him," because I didn't know enough about

15

what was going on in the background between them both. Was there something else going on? Is there a really good reason why [Petitioner] would want to go forward to trial that I wasn't aware of? I just didn't know enough.

. . . .

But then I figured, Judge, that [Dunn] went through the hearing in front of the magistrate judge. I know he was in front of you a couple of times before trial. And who was I, local counsel, to tell another attorney, "You shouldn't be doing this."

Id. at 43-45, 47-48.

"Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." Lafler v. Cooper, 566 U.S. 156, 162 (2012). The first prong of the Strickland test asks whether "counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688. As to Strickland's second prong, in the context of a rejected plea offer, the prejudice prong requires the movant to show "a reasonable probability that but for counsel's ineffectiveness: (1) 'the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)'; (2) 'the court would have accepted its terms'; and (3) 'the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.'" Osley v. United States, 751 F.3d 1214, 1222 (11th Cir. 2014) (quoting Lafler, 566 U.S. at 164). But "after the fact testimony concerning [the movant's] desire to plead, without more, is

16

insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer." Diaz v. United States, 930 F.2d 832, 835 (11th Cir. 1991).

Even assuming arguendo that Dunn was ineffective with respect to his advice surrounding the plea agreement, the Court's inquiry into Strickland's first prong does not end there. The Court must consider all of the information and advice Petitioner had at the time he rejected the Government's offer, including the advice he received from Newtson, which may vitiate Dunn's ineffectiveness, because "[t]he Sixth Amendment ensures the right to effective assistance of 'an attorney.'" Ochoa v. United States, 45 F.4th 1293, 1299 (11th Cir. 2022) (quoting Strickland, 466 U.S. at 685)). Indeed, the Sixth Amendment does not entirely shield a defendant from receiving bad advice. See id. (citing Logan v. United States, 910 F.3d 864, 870 (6th Cir. 2018); Clark v. Chappell, 936 F.3d 944, 968-69 (9th Cir. 2019)). Upon observing Petitioner's and Newtson's demeanor and testimony during the evidentiary hearing, the Court finds them both credible to the extent stated herein. And after considering Newtson's affidavit and testimony at the evidentiary hearing, the Court finds that she effectively advised Petitioner with respect to the Government's plea offer such that Petitioner received effective assistance of an attorney.

The Eleventh Circuit has addressed an analogous situation. In Ochoa, the Court had "to consider whether a criminal defendant's Sixth Amendment right

17

to counsel [wa]s violated when multiple attorneys represent[ed] him in plea negotiations with the government and one of them labor[ed] under a conflict of interest." Ochoa, 45 F.4th at 1296. The Court found that the defendant did "not allege sufficient facts to establish that [the attorney's] alleged conflict deprived [him] of effective assistance of counsel" because the defendant "was simultaneously represented by [another attorney], whom he d[id] not allege was conflicted." Id. at 1300. The Eleventh Circuit's opinion clearly supports a finding that despite one attorney's ineffectiveness, if a defendant has been competently advised by another lawyer, he has received all that the Sixth Amendment requires:

> [T]he Sixth Amendment confers "an affirmative right (the right to effective assistance of counsel at critical proceedings), not a negative right (the right to be completely free from ineffective assistance)." Logan, 910 F.3d at 870. The Sixth Amendment does not "include the right to receive good advice from every lawyer a criminal defendant consults about his case." Clark, 936 F.3d at 968-69.

Id. at 1299 (internal citations modified).

The Eleventh Circuit cited with approval two cases from the Sixth and Ninth Circuits that addressed situations similar to the one here. See id. (citing Logan, 910 F.3d at 870; Clark, 936 F.3d at 968-69). In the Sixth Circuit case, the defendant's counsel of record advised the defendant that the government had offered him "a very good plea deal that avoided the high risks of proceeding to trial"; the defendant agreed and "signed the plea agreement" that included a

18

ten-year sentencing cap. <u>Logan</u>, 910 F.3d at 866. The defendant's family, however, retained a second attorney. The two attorneys met, and the first attorney provided the second attorney with "the complete discovery packet." <u>Id.</u> at 865. The second attorney, while not counsel of record, subsequently "convinced [the defendant] to reject the plea deal at the change of plea hearing, because [the second attorney] thought he could 'beat the case.'" <u>Id.</u> at 867. The second attorney failed to appear in the case for several months, so the first attorney continued representing the defendant, and met with him several times to discuss the government's plea offers and the evidence in the case. The second attorney eventually became counsel of record and based upon his advice, the defendant accepted another plea deal that did not contain the ten-year sentencing cap. <u>Id.</u> The defendant was sentenced to thirty-five years in prison. <u>Id.</u> at 868. Following his conviction, the defendant filed a motion to vacate under § 2255, which the district court denied, reasoning that the first attorney's "effective assistance . . . counterbalanced [the second attorney's] 'abysmal' performance." <u>Id.</u> The defendant appealed, and the Sixth Circuit affirmed, finding that the defendant "received both competent and deficient advice" regarding the first plea offer, and that "[s]uch conflicting advice undercuts [the defendant's] claim of ineffective assistance of counsel." <u>Id.</u> at 869-70. That is so because despite also receiving deficient advice, the defendant "received all the

19

information needed to make an informed decision on whether to accept the plea deal from his counsel of record." Id. at 871.

In the Ninth Circuit case, the defendant "had the benefit of multiple attorneys," two of whom provided him with "informative advice" regarding a plea offer while the third recommended going to trial. Clark, 936 F.3d at 969. Finding the Sixth Circuit's decision in Logan persuasive, the Ninth Circuit concluded that the defendant "'received his Sixth Amendment right to effective assistance of counsel, regardless of [his attorneys'] contradictory advice.'" Id. (quoting Logan, 910 F.3d at 870).

Here, while Dunn was "lead counsel" and had conversations with Petitioner that Newtson was not privy to, Dunn asked Newtson to review the plea offer with Petitioner. Newtson did so. In fact, Newtson explained that in reviewing the offer, she did not "treat [Petitioner] any different than if he was [her] own client and he had personally retained [her]." Civ. Doc. 49 at 34. She reviewed the plea agreement with Petitioner and explained the charges, the sentencing guidelines, the seriousness, and the minimums. While Newtson did not review the discovery,[10] provide Petitioner any legal advice as to the discovery or how it related to the case, or directly express her opinion on what

---

[10] Based on the evidence submitted, it appears that Newtson at least attempted to review some of the discovery, but she was unable to do so. See Civ. Doc. 17-7 (email dated April 30, 2018, from Newtson to Dunn, advising that she was "still having a problem opening the discovery").

20

Petitioner should do because she "didn't think it was [her] place to go against lead counsel," she explained to Petitioner that the Government was prepared to prove the case against him and that the Government "had a lot of evidence" including the testimony of two co-conspirators; she also advised Petitioner that if he pled guilty, his sentence likely would be less severe and he faced a "very big risk that he would get more time if he got convicted and went to trial as charged versus if he was negotiating"; and she advised him that going to trial was a risk and the Government had a high conviction rate. See Civ. Doc. 24 at 2-3; Civ. Doc. 49 at 30, 34, 36-37, 40, 43-44. At the evidentiary hearing, Petitioner acknowledged that before he rejected the offer, he knew the plea agreement would not result in the dismissal of any charges, but instead would provide him with an opportunity of receiving a lower sentence; and he was aware of some of the evidence that the Government could present at trial, including the testimony of Whittaker and Ramirez-Chavez. Civ. Doc. 49 at 16, 18.

Upon due consideration, the Court finds that Newtson's discussions with Petitioner regarding the plea agreement were sufficient to counterbalance any ineffective assistance that Dunn provided. Newtson explicitly addressed the sentencing guidelines with Petitioner and explained that the Government had a lot of evidence and was prepared to prove its case. Petitioner was sufficiently advised of the offer's terms and the consequences of rejecting the plea and going

21

to trial. Being so advised, and knowing that his co-conspirators were testifying against him, Petitioner chose to proceed to trial, which was well within his rights to do. Because Petitioner received effective assistance from "an attorney," the Court finds that he fails to prove the first prong of the <u>Strickland</u> analysis.

Nevertheless, even assuming Petitioner could prevail on the first prong, his claims fail on the second prong. While Petitioner testified at the evidentiary hearing that but for Dunn's ineffective assistance, he would have accepted the Government's offer, his "after the fact testimony concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer." <u>Diaz</u>, 930 F.2d at 835. Indeed, contemporaneous evidence suggests otherwise. Petitioner testified that before the trial, he told Dunn he was innocent because he believed he was innocent. Civ. Doc. 49 at 20. When given the chance at sentencing to address the Court, Petitioner stated: "Just that I've been around with the wrong people. <u>And I don't have nothing to do with this</u>. . . . Just I was around with – around the wrong people. . . . I just want this to be fair. . . ." Crim. Doc. 87 at 70 (emphasis added). Years later, at the evidentiary hearing, the Government referenced Petitioner's statement made at his sentencing hearing and asked Petitioner, "Who are the wrong people?" Civ. Doc. 49 at 20. Petitioner responded, "<u>Whittaker and Mitchell Loor</u>." <u>Id.</u> (emphasis added). The questioning continued:

> Q. You blame someone else for what happened to you?

22

A. I'm not blaming anyone else for what happened to me. I just was not part of what they were doing.

. . . .

Q. So you claim now that you weren't part of what Whittaker and Ramirez-Chavez were doing?

A.     That's correct.

Id. at 20-21 (emphasis added).

Petitioner's statements directly contradict the factual basis accompanying the proposed plea agreement and undercut Petitioner's after-the-fact contention that he would have pled guilty but for Dunn's alleged ineffective assistance. See Ivory v. United States, 153 F.4th 1358, 1366-67 (11th Cir. 2025) (finding that a defendant's "persistent" refusal to accept responsibility and "adamant" protestations of "his innocence during all stages of his criminal proceedings" discounted his after-the-fact assertion that he would have pled guilty but for his counsel's ineffectiveness); Osley, 751 F.3d at 1225 (recognizing that while not dispositive, the defendant's "insistence on his innocence, both before and after trial, makes it more difficult to accept his claim that he would have taken a . . . plea deal"); see also Teers v. United States, 739 F. App'x 960, 967 (11th Cir. 2018) ("Additionally, Teers testified in his own defense at trial, maintaining his innocence throughout his testimony, and declined to allocute at sentencing, thereby foregoing an opportunity to accept responsibility."

23

(emphasis added)).[11] Before the Court would have accepted a plea of guilty, Petitioner would have had to admit that he was pleading guilty because he was guilty and that the facts set forth in the factual basis were true—including that he provided methamphetamine to Whittaker, Ramirez-Chavez, and Loor for distribution on more than one occasion. See Civ. Doc. 7-2 at 18, 21-24. His statements at sentencing and at the evidentiary hearing strongly suggest otherwise. Petitioner has not established that he would have pled guilty but for Dunn's alleged ineffectiveness.

Additionally, the risk of deportation was clearly a concern at the time Petitioner rejected the plea offer. See Civ. Doc. 49 at 19 (Petitioner testifying that he was concerned about his immigration status and knew he may be deported if he was found guilty at trial); Civ. Doc. 17-15 at 1 (email dated August 16, 2018 from Newtson to Dunn—three days after the plea offer was provided to the defense—advising that the prosecutor could not amend the

_____

[11] Notably, at a status conference shortly before the trial commenced, the prosecutor asked the Court to extend the plea deadline until after the Court ruled on Petitioner's motion to suppress, and explained that she had previously sent "a very detailed letter outlining the Government's evidence against the Defendant and how this would proceed, in order for counsel to be able to . . . have those discussions in depth with - - as far as the guidelines and statutory and all kinds of issues that were also laid out in a letter I sent to counsel." Crim. Doc. 181 at 25. The Court agreed to do so, asking whether the prosecutor had any reason to be optimistic about a plea or whether she was just wanting to ensure that Petitioner had everything in front of him before making a final decision about going to trial. See id. The prosecutor responded, "I'm not that optimistic. But I do want the record to be clear with all of that going forward." Id.

24

charge to a lesser that is not deportable). The Supreme Court has recognized that a reasonable defendant may choose to proceed to trial, despite very slim odds of success, even if it would only lower his odds of deportation from sure certainty to almost certainty. See Lee v. United States, 582 U.S. 357, 371 (2017). Petitioner's concern of being subject to deportation also cuts against his after-the-fact testimony that he would have pled guilty.

In sum, after reviewing the evidence and considering the testimony first-hand at the evidentiary hearing, the Court finds that Petitioner received effective assistance from Newtson with respect to the Government's plea offer, and regardless, he fails to show resulting prejudice from any ineffective assistance from Dunn. Therefore, Grounds One and Two are due to be denied.

### B. Ground Three

Citing multiple portions of the record, Petitioner contends that Dunn was ineffective throughout his representation of Petitioner, including during a pretrial suppression hearing, voir dire, and the trial. See Civ. Doc. 7 at 10. As such, Petitioner asserts that "this Court cannot be confident that the outcome of the trial would have been the same." Id.

Even assuming deficient performance, Petitioner has not shown prejudice. As noted by the Eleventh Circuit on direct appeal, "[t]he evidence of [Petitioner's] guilt was strong, if not overwhelming." Gutierrez, 810 F. App'x at

25

770.[12] Considering the record, Petitioner fails to show a reasonable probability exists that but for counsel's alleged deficiencies, the outcome of his trial would have been different.[13] Therefore, Ground Three is denied.

## C. Ground Four

According to Petitioner, the "cumulative effect" of Dunn's ineffectiveness as outlined in Grounds One through Three denied Petitioner "due process and effective assistance of counsel and resulted in his declining to accept the Government's proposed plea agreement." Id. at 12.

The Eleventh Circuit recognizes that the "cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation omitted), abrogated on other grounds by Davis v. Washington, 547 U.S. 813, 821 (2006). Of course, where there is no error or only a single non-prejudicial error, there can be no cumulative error. United States v. Allen, 269 F.3d 842, 847 (11th Cir. 2001).

---

[12] Petitioner also alleges that the evidence against him was "overwhelming" and that "[t]here was no defense." Civ. Doc. 7 at 5, 7.

[13] Even in the hands of a more capable trial attorney, there is no reasonable probability the outcome of the trial would have been different in light of the evidence presented.

Here, the Court finds that none of the grounds either singularly or cumulatively warrant relief. Thus, Ground Four is due to be denied.

### D. Ground Five[14]

Petitioner contends that he "is entitled to a new trial based on newly discovered evidence and resulting Brady and Giglio claims arising therefrom." Civ. Doc. 31 at 1 (emphasis omitted).  He contends that on May 15, 2024, James Hickox, a former Nassau County Sheriff's Deputy and DEA Task Force Officer who testified at the evidentiary hearing on Petitioner's motion to suppress, pled guilty to three counts of a superseding indictment in this Court after engaging in extensive corrupt conduct from 2017 to 2023. See id. at 2. According to Petitioner, had the Government disclosed the fact that "Hickox was a completely corrupt law enforcement officer who had a history of tampering with drug evidence," Petitioner would have had a "basis to move to suppress the search of the storage unit" where over two kilograms of methamphetamine were found and used against Petitioner at trial, and it would have provided Petitioner with an opportunity "to discredit the Government's entire case." Id. at 5, 8. The Government's response addresses this Ground. See Civ. Doc. 33. And Petitioner filed a reply. See Civ. Doc. 45.

---

[14] The Court denied Petitioner's request for an evidentiary hearing on Ground Five. See Order (Civ. Doc. 34) at 5; see also Order (Civ. Doc. 42).

27

Some background helps place this issue in context. On July 9, 2018, the Court held an evidentiary hearing on Petitioner's pre-trial motion to suppress.[15] See Minute Entry (Crim. Doc. 89), Transcript (Crim. Doc. 91). At the hearing, the Government presented the testimony of, among others, Matt Yarborough, the case agent; and Jeff Crook, a special agent with the DEA who completed the probable cause affidavit for the criminal complaint. See Crim. Doc. 91 at 2. The defense presented the testimony of, among others, Hickox. See id. Hickox testified that he was involved in Petitioner's case "in the beginning with surveillance and . . . other investigative efforts." Id. at 96. He also testified that he assisted Yarborough with the search of a storage unit on August 16, 2017, and after Petitioner was arrested, he assisted Task Force Officer Baldwin with processing some of the evidence they had collected. Id. at 98-99. Following the evidentiary hearing, the Court denied Petitioner's motion to suppress. See Crim. Doc. 136. Petitioner then proceeded to a five-day jury trial, where the jury

---

[15] Petitioner sought to suppress: all written or oral statements made by Petitioner to any law enforcement officer or others in connection with the case; all tangible evidence seized or created in connection with the detention and arrest of Petitioner; all law enforcement testimony regarding Petitioner's actions while detained or otherwise concerning the tangible evidence or statements previously referenced in the motion; and all "ping technology" records, results, and testimony therefrom. Crim. Doc. 43. At the suppression hearing, the Government stated that Petitioner did not make any post-arrest statements, so there were no statements to suppress. Crim. Doc. 91 at 8, 22.

found him guilty as charged on November 30, 2018. Hickox did not testify at Petitioner's trial.

To demonstrate a Brady violation, Petitioner must prove that (1) the government possessed evidence favorable to the defense; (2) Petitioner did not possess the evidence and could not have obtained it with any reasonable diligence; (3) the government suppressed the favorable evidence; and, (4) the evidence was material in that a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Neufeld, 154 F. App'x 813, 818 (11th Cir. 2005) (citation omitted); LeCroy v. Sec'y Fla. Dep't of Corr., 421 F.3d 1237, 1268 (11th Cir. 2005) (citation omitted); Chandler v. Moore, 240 F.3d 907, 915 (11th Cir. 2001) (citation omitted). With respect to a Giglio claim, "'a petitioner must establish that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." Maharaj v. Sec'y for Dep't of Corr., 432 F.3d 1292, 1312 (11th Cir. 2005) (quoting Tompkins v. Moore, 193 F.3d 1327, 1339 (11th Cir. 1999)).

Petitioner fails to show either a Brady or Giglio violation. Petitioner all but concedes that the Government did not know of Hickox's criminal conduct until after Petitioner's trial. See Civ. Doc. 31 at 13 ("Crucially, none of this was known to the defense (or apparently to prosecutors) at the time of [Petitioner's]

29

trial and suppression hearing."); <u>see also</u> <u>id.</u> at 4 (quoting an email from the Government dated February 26, 2025, responding to Petitioner's <u>Brady</u>/<u>Giglio</u> request[16]). There was no evidence, favorable or otherwise, for the Government to disclose prior to the suppression hearing or trial—the Government simply did not have it because Hickox was not advertising his criminal activities. The criminal complaint filed against Hickox relied on information provided by a cooperating defendant who was arrested in August 2022—nearly four years <u>after</u> Petitioner's trial. <u>See</u> Doc. 1, No. 3:23-cr-47-WWB-LLL.

Nor did the Government present false testimony or otherwise fail to correct false testimony. The Government did not call Hickox as a witness at the suppression hearing or at trial—Petitioner called Hickox as a witness at the suppression hearing, but again, the Government did not have information at

---

[16] The email stated:

> I am writing to follow up on the <u>Brady</u>/<u>Giglio</u> issue regarding former TFO Hickox that you had identified. As reflected in the letter below, an Assistant United States Attorney assigned to the Hickox matter, 3:23cr47, has reviewed the investigative materials in that case and found no mention of [Petitioner] or any discussion of his offense conduct or the search of the storage facility at Life Storage. <u>While the Assistant United States Attorney did find reference to an incident where Hickox and his codefendant broke into a storage unit and stole narcotics and cash, the described incident occurred in 2021, after the offense conduct in [Petitioner's] case.</u> The case agents also reviewed the case files and found no positive results. Additionally, I have previously provided the plea agreement in Hickox's case, which describes his criminal conduct that the United States was able to substantiate and prove.

Civ. Doc. 31 at 4 (emphasis added).

30

that time that it was required to disclose or otherwise fail to correct any false testimony. Further, Hickox did not author the affidavit in support of the search warrant or the criminal complaint in Petitioner's case and his relatively limited participation in the case could not have affected the outcome of the investigation or trial. To the extent Petitioner claims that he could have used the information about Hickox's illicit activity to affect the outcome of the suppression hearing or trial, the Court finds such assertions to be without merit. Petitioner simply fails to show a violation of <u>Brady</u> or <u>Giglio</u>. Thus, Ground Five is due to be denied.

Accordingly, it is

**ORDERED**:

1.     Petitioner's Second Amended Motion Under 28 U.S.C. § 2255 (Civ. Doc. 7) and Third Amended Motion (Civ. Doc. 31) are **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.     The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close the file.

3.     If Petitioner appeals, the Court **GRANTS** a certificate of appealability on Grounds One and Two only. The Eleventh Circuit has not directly addressed the issue analyzed in Grounds One and Two, namely, whether a defendant who receives both competent and deficient advice with respect to whether he should accept a plea offer received his Sixth Amendment

31

right to effective assistance of counsel. Thus, the Court finds that issue is "'adequate to deserve encouragement to proceed further.'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).

    **DONE AND ORDERED** at Jacksonville, Florida, this 23rd day of June, 2026.



TIMOTHY J. CORRIGAN
Senior United States District Judge

JAX-3 6/23
c:
Counsel of Record